A00A0722. TURPEN et al. v. RABUN COUNTY BOARD OF
COMMISSIONERS et al.
(537 SE2d 435)

POPE, Presiding Judge.

Citizens of Rabun County sued the county and Rabun County Hospital Authority to enjoin the county's purchase of a nonprofit hospital's assets on several grounds, including that the county failed to comply with the Hospital Acquisition Act, OCGA § 31-7-400 et seq. The trial court found the law inapplicable. After the citizens appealed, the sale was finalized. The citizens enumerate only one error, that the court erred in holding that the transaction was not governed by the Act.

Enacted in 1997, the Georgia law prohibits an "acquiring entity" from purchasing or leasing a hospital from a nonprofit corporation and prohibits a nonprofit corporation from selling or leasing a hospital to an acquiring entity, without first providing detailed notice to the Attorney General of the proposed transaction. OCGA §§ 31-7-400; 31-7-401. The Attorney General must publish notice of the proposed transaction and later hold a public hearing "to ensure that the public's interest is protected . . . by requiring full disclosure of the purpose and terms of the transaction and providing an opportunity for local public input." OCGA §§ 31-7-404 to 31-7-406. By statute, the transaction is not in the public interest,

> unless there has been adequate disclosure that appropriate steps have been taken to ensure that the transaction is authorized, to safeguard the value of charitable assets, and to ensure that any proceeds of the transaction are used for appropriate charitable health care purposes.

OCGA § 31-7-406.

The Act also provides that any transaction made in violation of

the Act "shall be null and void." OCGA § 31-7-412 (a). An acquiring entity found violating the Act can be fined $50,000 and have its permit to operate as a hospital revoked. OCGA §§ 31-7-408; 31-7-412 (a).

On April 2, 1999, Rabun County entered into a "Sales Contract" with The Woodlands Foundation, Inc. for the purchase of 7.68 acres of land, buildings and equipment that included two hospitals known as Woodridge Hospital and Ridgecrest Hospital and a business known as Mountain Home Health.[1] Woodlands was a nonprofit corporation that was in financial distress. Rabun County agreed to pay Woodlands $3.7 million for these assets, and the closing was scheduled to occur on September 1, 1999. The contract included certain contingencies including compliance with the Act. Pending the closing, in a separate agreement, Rabun County, through the hospital authority, agreed to lease the facilities from Woodlands and operate them as going concerns.

On May 8, 1999, certain citizens filed suit to stop the purchase and cancel the lease, raising two alleged violations of the state constitution, a claim that the transaction was a waste of county tax dollars and a claim that it violated the Hospital Acquisition Act. The citizens contend that the county paid too much for the assets.

On May 21, 1999, Woodlands, Rabun County, and Rabun County Hospital Authority jointly filed notice under the Act and paid the required $50,000 fee. See OCGA § 31-7-402 (a), (c). The applicants identified the Sales Contract and the lease as the applicable contracts. In its cover letter, Woodlands argued to the Attorney General that the law did not apply because the transaction involved two nonprofit entities. The Attorney General disagreed and told Woodlands that the application was incomplete in other respects.

On June 1, after a hearing, the court granted a preliminary injunction based on one of the constitutional arguments, a finding that the Hospital Acquisition Act was applicable to the lease and a determination that its requirements had not been met. The court enjoined the county from operating the facilities "until such time as the proceedings before the Attorney General have been completed." Rabun County then terminated the lease. The citizens moved for a permanent injunction.

On July 28, Woodlands wrote to the Attorney General arguing that the Act was not applicable to the Sales Contract because the county was the acquiring entity and counties are not subject to the law. The Attorney General again disagreed. Woodlands offered a third argument — that the Act did not apply because the proceeds of

---

[1] At the time, Rabun County, through the Rabun County Hospital Authority, already operated one hospital — Rabun County Memorial Hospital.

the sale were going to bondholders of the bankrupt nonprofit corporation — but the Attorney General disagreed. The county and Woodlands argued for a fourth time that the statute did not apply — this time by offering to turn in Woodlands' permit to operate Ridgecrest Hospital (Woodridge Hospital had already closed), so that Woodlands would no longer be characterized as a hospital under § 31-7-400 (8) of the Act. The Attorney General accepted this proposal and returned the $50,000 fee. Woodlands tendered Ridgecrest's permit on August 27 (it had ceased medical activities on August 11).

Rabun County then sought to dissolve the preliminary injunction and obtain validation of the revenue bond necessary to pay for the purchase. After a hearing, the court agreed with the Attorney General, dissolved its preliminary injunction, validated the bond and entered final judgment against the citizens on all counts. The final order was entered on September 13, 1999, and an appeal taken immediately. On November 16, 1999, the sale transaction closed, and the proceeds were disbursed by the trustee in bankruptcy as per the order of the bankruptcy court. The record indicates that as of October 6, both hospitals remain closed and that it would take several months to reopen them because of certification requirements and necessary improvements.

1. Rabun County and the hospital authority have moved to dismiss the appeal on the grounds that the appeal is moot because the transaction has already occurred. The Supreme Court has recently restated the definition of mootness: "a case is moot when its resolution would amount to the determination of an abstract question not arising upon existing facts or rights . . . [but] a case which contains an issue that is capable of repetition yet evades review is not moot. . . ." *Collins v. Lombard Corp.*, 270 Ga. 120, 121 (1) (508 SE2d 653) (1998).

The citizens sought an injunction prohibiting the sale and a declaration that the lease and sale by Woodlands to the county and hospital authority be declared void as a matter of law. Although the question of injunctive relief, per se, is moot,[2] the declaratory relief is not. The Act provides that any transaction made in violation of the requirements of the Act "shall be null and void." OCGA § 31-7-412 (a). Therefore a declaration that the transaction did not conform with the Act is not moot. By operation of law the transaction would be null and void. The county and the authority closed the transaction subject to that risk.

---

[2] The filing of a notice of appeal in injunction cases does not serve as a supersedeas. *Citizens to Save Paulding County v. City of Atlanta*, 236 Ga. 125 (223 SE2d 101) (1976). When the injunctive relief sought by appellants cannot be granted, the appeal is moot. *Brown v. Spann*, 271 Ga. 495, 496 (520 SE2d 909) (1999).

2. We must next address whether the Hospital Acquisition Act applies to counties, i.e., whether counties are "acquiring entities" as defined in the Hospital Acquisition Act.

The Act provides that "acquiring entity" means

an individual, business corporation, general partnership, limited partnership, limited liability company, limited liability partnership, joint venture, nonprofit corporation, hospital authority, or any other for profit or not for profit entity which is a purchaser or lessee of an acquisition.

OCGA § 31-7-400 (1). The citizens argue that the definition is broad enough to include counties, either under the term "hospital authority" or under the final phrase "any other for profit or not for profit entity. . . ." We agree that the catchall phrase is broad enough to include Rabun County in the transaction at issue in this case.

Under Georgia law, a county and a hospital authority are two separate and distinct entities, both of which are authorized to own, operate and lease hospitals. Several statutes show this to be true.[3] Case law shows the same thing. See *Thomas v. Hosp. Auth. of Clarke County*, 264 Ga. 40, 41-42 (1) (440 SE2d 195) (1994); *Bradfield v. Hosp. Auth. of Muscogee County*, 226 Ga. 575, 583 (1) (176 SE2d 92) (1970). "The legislature is presumed to know the condition of the law and to enact statutes with reference to it." *State v. Tiraboschi*, 269 Ga. 812, 814 (504 SE2d 689) (1998). Thus, the legislature did not include counties as acquiring entities under the term "hospital authorities."

However, Rabun County is included under the broad catchall provision: "any other for profit or not for profit entity which is a purchaser or lessee of an acquisition." OCGA § 31-7-400 (1). Taken as a whole, we read § 31-7-400 (1) to include any other entity of the same kind or category as those specifically enumerated.

The longstanding rule of construction known as ejusdem generis

---

[3] OCGA § 31-6-47 (a) (9) distinguishes between hospitals owned by political subdivisions of the state and hospital authorities. OCGA § 31-7-51 (a) (8) and (9) define "publicly operated" and "publicly owned" medical facilities as those operated or owned by a "county, municipality, hospital authority, or any combination thereof." OCGA § 31-7-75.1 establishes irrevocable trust funds for the net proceeds of the sale or lease of a hospital by both hospital authorities and political subdivisions of the state. OCGA § 31-7-85 provides that counties and cities may contract with hospital authorities, and the contracts may provide for the sale or lease of hospitals to authorities. OCGA § 31-7-86 refers to the sale or lease of property by cities or counties to authorities. OCGA § 31-14-14 provides certain immunity for certain officials who are employed in hospitals including, among others, those operated by the state, a political subdivision of the state or a hospital authority. OCGA § 36-60-7 makes plain that counties and municipal corporations may build and equip hospitals directly or indirectly, through a hospital authority.

provides "that a general term following specific terms is confined to the same kind or category of thing. [Cits.]" *Witty v. McNeal Agency*, 239 Ga. App. 554, 557 (2) (a) (521 SE2d 619) (1999). The entities specifically enumerated in OCGA § 31-7-400 (1) are entities of all forms that operate hospitals regardless of whether they are designed to make a profit. The definition is not limited to private entities only — it includes hospital authorities. The definition is not limited to statutory nonprofit corporations. See OCGA § 14-3-101 et seq. It specifically includes those entities yet also includes all other nonprofit entities. And hospital authorities are nonprofit entities. OCGA §§ 31-7-77; 31-7-84. Finally, "hospitals, whether owned directly by a county or city, or by an authority, are designed and intended to serve identical purposes of discharging the governmental obligation to provide for the health of the people." (Citations and punctuation omitted.) *Bradfield*, 226 Ga. at 583 (1). The statute was clearly designed to include any other entity that intends to operate a hospital.

Here, the county has purchased the assets of two hospitals for the specific purpose of using them to operate a hospital. As stated in the county's brief, "Rabun County proposed to purchase the Woodlands Foundation, Inc. hospital facilities, and to lease those facilities to the Hospital Authority of Rabun County for operation." Based on this undisputed fact, Rabun County is an "acquiring entity" under the Act.

Construing the Act so that counties that intend to operate hospitals acquired from nonprofit corporations are not included would undermine some of the major policies underlying the Act. "When interpreting a statute we are required to look for the intent of the legislature and construe statutes to effectuate that intent." (Citation and punctuation omitted.) *G.I.R. Systems v. Lance*, 219 Ga. App. 829, 832 (3) (466 SE2d 597) (1995). In response to a dramatic increase during the 1990s in the number of conversions of nonprofit hospitals to for-profit entities, many states passed legislation designed to protect the public's interest in these transactions.[4] "Legislative action was spurred by the secrecy that surrounded conversion activity, the perception that the assets were routinely undervalued and the suggestion that these transactions often involved self-dealing."[5] Legislation was also prompted by concern about the disposition of the proceeds of any acquisition.[6]

---

[4] Kevin F. Donohue, Crossroads in Hospital Conversions — A Survey of Nonprofit Hospital Conversion Legislation, 8 Ann. Health L. 39, 42 (1999).

[5] Id., citing Phillip P. Bisesi, Comment, Conversion of Nonprofit Health Care Entities to For-Profit Status, 26 Cap. U. L. Rev. 805, 820 (1997).

[6] Rachel B. Rubin, Comment, Nonprofit Hospital Conversions in Kansas: The Kansas Attorney General Should Regulate All Nonprofit Hospital Sales, 47 Kan. L. Rev. 521 (1999).

The notice to the Attorney General required under the Georgia Act reveals the concerns of the Georgia legislature. Among other things, the notice must include: the terms and a copy of the proposed agreement and any related agreements including leases, management contracts, and service contracts; the acquisition price; recent valuations of the hospital's assets; all donative documents reflecting the purposes of prior gifts to the nonprofit of more than $100,000 and the report of an expert addressing the following criteria — whether the disposition is consistent with the directives of the major donors; whether the board of the nonprofit exercised due diligence and appropriate procedures in deciding to dispose of the assets, in selecting the acquiring entity and in negotiating the terms; whether any conflict of interest was disclosed; whether the nonprofit will receive fair value; if the disposition is to another nonprofit, whether the seller will receive an enforceable commitment for fair and reasonable community benefits for its assets; whether the proceeds will be used for charitable health care purposes consistent with the selling nonprofit's original purpose; whether there are sufficient safeguards to assure the affected community continued access to affordable care and to the range of services historically provided by the nonprofit; and whether the acquiring entity has made an enforceable commitment to provide care to the needy and other criteria. OCGA §§ 31-7-402 (a); 31-7-406. The Act also requires certification that "the transaction will not adversely affect the availability or accessibility of health care services in the county in which the main campus of the hospital is located." OCGA § 31-7-403 (8). Finally, the Act requires extensive disclosure of the possibility of conflicts of interest. OCGA § 31-7-403.

Thus, among other things, the General Assembly clearly intended to provide: public disclosure of nonprofit hospital dispositions; an assurance that nonprofit corporations are receiving fair value and that the transactions are free from conflicts of interest; oversight by the public and the Attorney General of disposition of the proceeds collected by the nonprofit corporation and assurance of continued access to health care for the community including the needy. Most of these interests would be lost if counties are not included in the definition of "acquiring entity."

3. On April 2, 1999, when the county and Woodlands entered into the Sales Contract, and on May 21, when they submitted notice under the Act, Ridgecrest Hospital had a hospital permit — and therefore was a hospital as defined in the Act. OCGA § 31-7-400 (8). The county and the hospital authority contend that if a nonprofit gives up its hospital permit while the sale of the hospital assets is pending, the transaction is no longer subject to the Act. We do not agree that such a loophole exists under the Act and find instead that

this construction does not reflect the intent of the legislature.

As stated above, the General Assembly clearly intended to provide for oversight of disposition of the proceeds collected by the non-profit corporation, knowing that these nonprofit corporations would be getting out of the hospital business, i.e., many would be turning in their permits as a matter of course. Therefore, allowing a nonprofit corporation to escape application of the Act by relinquishing its hospital permit after it has entered into an agreement covered by the Act would be inconsistent with the legislative intent.

OCGA § 31-7-400 (8) cannot be construed to mean that a nonprofit corporation with a hospital permit as of the date of an agreement to sell or as of the date of the original notice provided under the Act may simply turn in its permit to avoid application of the Act. For the remainder of the life of the proposed transaction or the public review process provided by the Hospital Acquisition Act, a hospital is a hospital for the purposes of the Act.

4. The citizens also argue, based on *Sparks v. Hosp. Auth. of the City of Bremen &c.*, 241 Ga. App. 485, 488-489 (2) (526 SE2d 593) (1999), that the county and authority violated the Act as of April 2, 1999, the date they entered into the Sales Contract and lease.[7]

But in *Sparks*, there was only one agreement that provided that Tanner would lease most of the real property of the hospital, purchase most of the personal property and operate the hospital. Even though the agreement provided that it would not be consummated until after the Attorney General approved the transaction, it also stated that it "became a legally binding obligation on the parties effective immediately upon execution and delivery. . . ." Thus, it took effect immediately, regardless of the contingency provision, and therefore violated the intent of the Act to provide notice in advance of consummation of a transaction.

Here there were two separate agreements, a sales contract and a lease. The lease agreement violated the Act as of the day it was signed because it went into effect that day and notice had not been provided under the Act. The trial court so held on June 1, 1999. Thus, the lease agreement was null and void under the Act. OCGA § 31-7-412 (a). However, the "Sales Contract" dated April 2, 1999, was a typical real estate contract that provided that the sale would close months later, i.e., the sale would be consummated at the time of closing. The notice provided on May 21, 1999, was more than 90 days in advance of September 1, 1999, the proposed closing date, and therefore in accord with the Act.

---

[7] See OCGA § 31-7-89.1 for application of the Hospital Acquisition Act to sales by a hospital authority.

The critical date from which the 90 days must be calculated is the date any part of the sale or lease effectively transfers ownership, operation or control of the hospital to the acquiring entity. OCGA § 31-7-401. That date is the same as the date of a signed agreement only if the agreement effectively transfers ownership, operation or control of the hospital at that time, as the agreement in *Sparks* did. Accordingly, "acquiring entities" subject to the Act may give proper notice of a proposed transaction after signing a purchase and sale agreement so long as the agreement is not effective until more than 90 days after the notice and it contains a clause making the closing contingent on the Hospital Acquisition Act review process.

5. In summary, we reverse the trial court's holding that the Act is not applicable to the transaction. Our decision renders the transaction null and void. OCGA § 31-7-412 (a). From a practical standpoint, it may be impossible to undo the transaction. Because we do not have all the facts related to the consummation of the transaction, we leave that issue to the trial court.

*Judgment reversed. Miller, J., concurs. Smith, P. J., concurs specially.*

SMITH, Presiding Judge, concurring specially.

An old and wise saying tells us that hard cases make bad law. This is just such a "hard case," as was *Sparks v. Hosp. Auth. of the City of Bremen &c.*, 241 Ga. App. 485, 490 (526 SE2d 593) (1999). Although I agree with the result in this case, I cannot agree with the reasoning or all that is said in the majority opinion.

The lease agreement here cannot be distinguished in any meaningful way from that in *Sparks*. Yet the majority, authored by the author of *Sparks*, treats them as very different. In *Sparks*, this court stated that the parties there "agreed to the terms and the conditions of the transaction, but agreed *that it would not be effective* until the Attorney General approved the agreement." (Emphasis supplied.) Id. at 486 (1). Now, however, the majority distinguishes this case from *Sparks* by saying that *Sparks* "took effect immediately, regardless of the contingency provision," majority opinion at 197, and that such an agreement "effectively transfers ownership, operation or control of the hospital" at the time it is signed. Majority opinion at 197.

As I indicated in my special concurrence in *Sparks*, I am concerned about the flaws, both ambiguities and omissions, in the Hospital Acquisition Act, OCGA §§ 31-7-400 through 31-7-412. It is entirely possible, in my view, that it is these flaws that have led to the majority's strained analysis.

DECIDED JULY 14, 2000

*Meadows, Ichter & Trigg, Michael J. Bowers, T. Joshua R. Archer, Stockton & Stockton, Lawrence A. Stockton, Jr.*, for appellants.

*Charles L. Clay*, for appellees.