**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

***DEADLINES ARE NO LONGER TOLLED IN THIS***
***COURT. ALL FILINGS MUST BE SUBMITTED WITHIN***
***THE TIMES SET BY OUR COURT RULES.***

**March 16, 2021**

# In the Court of Appeals of Georgia

A20A1696. YAKOB et al. v. KIDIST MARIAM ETHIOPIAN
ORTHODOX TEWAHEDO CHURCH, INC

GOBEIL, Judge.

This appeal arises from a dispute between Kidist Mariam Ethiopian Orthodox

Tewahedo Church (the "Church") and its former priest, Abba Yakob, who serves as

Archbishop over several churches, and seven members of the Church's administrative

board (collectively, Yakob and the defendant board members are referred to as the

"Defendants"). The Church filed a complaint seeking to dispossess Yakob from a

portion of real estate wholly owned by the Church (the real estate is referred to as the

"church building"); enjoin the defendant board members from "disrupting Church

services"; prevent the defendant board members from acting as a replacement board

of directors; and obtain declaratory relief concerning the conduct of a meeting of the Church's general assembly.

The underlying case is ongoing, but the trial court has issued interlocutory injunctions and orders that form the basis of this appeal. In the first order on appeal, the trial court granted the Church's motion to compel the defendant board members' attendance at administrative board meetings or, alternatively, should those members fail to attend scheduled board meetings, deem a quorum established if a majority of board members attended the meeting.[1] Also, the Defendants appeal from a 2017 interlocutory injunction concerning Holy Week worship services and governing the parties' respective access to the church building.

As an initial matter, the Defendants argue that the underlying dispute is ecclesiastical in nature, and therefore the trial court lacks subject matter jurisdiction.

---

[1] In the same order, the trial court also granted the special master's motion to destroy certain ballots and denied the Holy Synod of the Ethiopian Orthodox Tewahedo Church, Inc.'s (the "Synod") objection to the Church as the real party in interest. The Synod is the highest ecclesiastical council in the Ethiopian Orthodox Tawahedo Church. Prior to the entry of this order, the Synod moved to intervene in the case. The Defendants consented to the motion, but the Church opposed it, and the court conducted a hearing on the issue. In its order denying the motion to intervene, the court ruled that the Synod could not show a protectable interest in the secular issues before the court. This order is not at issue in this appeal, nor have the Defendants appealed the trial court's decision regarding the Synod's real-party-in-interest challenge.

2

The Defendants also argue that the trial court erred by granting the motion to compel because doing so upset the status quo. Finally, the Defendants contend that the 2017 injunction violates the First Amendment's Free Exercise and Establishment clauses by restraining Yakob from performing his religious duties. As explained below, we reverse the trial court's grant of the Church's motion to compel and affirm the interlocutory injunction regarding access to the church building.

We begin by sharing some background of the Church and the history leading to this appeal. A 1995 decision by this Court relates to this very Church and provides helpful background. In *Kidist Mariam Ethiopian Orthodox Tawahedo Church, Inc. v. Kidist Mariam Ethiopian Orthodox Tawahedo Church, Inc.* ("*Kidist I*"), 219 Ga. App. 470 (465 SE2d 491) (1995), this Court described the Church as follows:

> The Kidist Mariam Church was established under Georgia's Nonprofit Corporation Code, OCGA § 14-3-101 et seq. and is dedicated to the religious, spiritual and liturgical precepts of a religious body known as the Ethiopian Orthodox Tawahedo Church ("EOTC"). However, the corporation's articles of incorporation reserve control of the internal affairs of the corporation and its bylaws provide the Kidist Mariam Church with autonomy, and reflect the corporation's limited acceptance of the final authority of the Archbishop and, under him, of the clergy, in matters relating to religious faith and the observance of religious practice and church liturgy.

3

Id. at 471 (punctuation and footnote omitted). We explained that the Church's structure is a "hybrid" of the congregational and hierarchical forms of church governance,[2] noting that "[w]hile the [Church] corporation submits to EOTC's hierarchical dictates regarding religious, spiritual and liturgical matters, it reserves control of the internal affairs of the corporation and provides the [Church] with autonomy." Id. at 473 (1).[3] The Church's bylaws establish an internal corporate

[2] A congregational church is one that is "strictly independent of other ecclesiastical associations, and one that so far as a church government is concerned, owes no fealty or obligation to any higher authority," and control of the church's decisions and local church property (such as the church building) rests with the local church's members. *Crumbley v. Solomon*, 243 Ga. 343, 343-344 (254 SE2d 330) (1979) (citation and punctuation omitted). On the other hand, hierarchical churches are "those organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." Id. at 344 (citation and punctuation omitted). In a hierarchical church, to determine whether the local or parent church has the right to control local property, we apply "neutral principles of law," including "state statutes, corporate charters, relevant deeds, and the organizational constitutions of the denomination." Id. at 343 (citation and punctuation omitted).

[3] In their brief on appeal, the Defendants contend that the Church is "ecclesiastically hierarchical" in structure, but they point to nothing in the record to support this contention. While they maintain that this Court's application of *Kidist I* to the facts of the instant case should be made with "due recognition" that the Church expressly affirmed its allegiance to EOTC in 1995, the Defendants have failed to demonstrate how the recognition of the Patriarch as the "supreme *religious* leader of the [C]hurch" conflicts with our prior determination that the Church's governance structure is a hybrid of congregational and hierarchical.

4

governance structure consisting of a general assembly, an administrative board, an executive committee, and an audit committee. The administrative board's functions include entering into contracts, suing, and being sued on behalf of the Church; allocating the annual budget; and preparing and submitting annual reports, and short and long term plans to the general assembly for approval. The general assembly has the highest authority with regard to property and related rights of the Church.

With this history in mind, we now turn to the facts relevant to the instant appeal, which show that Yakob served as priest of the Church until 2016. As part of his employment, he enjoyed use of a parsonage, or residence, located within the church building. In 2005, the Patriarch of the EOTC appointed Yakob Archbishop of the Diocese of Georgia, Tennessee, South Carolina, and North Carolina, and Florida.

According to the Church's complaint, the administrative board met on October 9, 2016, and voted to terminate Yakob's employment as priest for the Church.[4] The following day, the Church sent Yakob a letter detailing the meeting's events, and

---

[4] The Defendants dispute the facts, circumstances, and effect of this vote, as well as the legitimacy of the Church's termination of Yakob's position as priest. However, the events of October 9, 2016, precipitated the facts giving rise to the Church's complaint, and therefore this information provides relevant background. The parties's disagreement on Yakob's employment termination is not relevant to the narrow issues presented in this appeal, and we express no opinion on that issue.

5

demanding that Yakob vacate the parsonage, noting its "authority to control its own property and those employed by and receiving benefits from the Church." The Church noted that its decision to terminate Yakob's employment as priest was not an attempt "to suspend or terminate [Yakob's] religious role as Archbishop of the Diocese[.]"

The Church alleges that on Sunday, October 16, 2016, Yakob and several of his supporters attempted to gain access to the church building and later "disrupted the worship services by chanting, singing, and banging drums for more than 30 minutes during the liturgy, arguing that [ ] Yakob should be allowed inside and that the service could not continue without him." According to the Church, Yakob led a second disruption the following Sunday at which he and his supporters, including the defendant board members, announced they were "cancelling" the October 10, 2016 termination letter and dissolving the administrative board. Several individuals then purported to elect a replacement board and attempted to take control of the Church and its property by changing the church building's locks and security codes, providing Yakob with access to the Church's property, switching the Church's registration with the Georgia Secretary of State, changing access to the Church's bank accounts, and "otherwise acting on behalf of the Church."

6

In the complaint, as amended, the Church sought: (1) a dispossessory writ ordering Yakob removed from the parsonage; (2) a temporary restraining order and interlocutory and permanent injunctive relief prohibiting the replacement board from acting on behalf of the Church "pending resolution of the question as to the [replacement] [b]oard's authority to act on behalf of the Church" and barring the Defendants from "disrupt[ing]" Church services; and (3) declaratory relief concerning the Church's legal rights and obligations in connection with the conduct of an extraordinary meeting of the Church's general assembly.

In October 2016, the trial court entered a temporary restraining order ("TRO"). The TRO established an access schedule for the church building, granting the Church and its supporters access to the church building on Sunday mornings for worship, and granting the Defendants and their supporters access to the church building on Sunday afternoons. Additionally, the TRO permitted Yakob to maintain his residence located in the parsonage pending the resolution of the Church's dispossessory claim, but barred Yakob from entering the church building, fellowship hall, or any other building located on Church property with the exception of the Defendants' allotted Sunday hours for peaceful worship. With regard to the administrative board, the TRO designated the board identified in the Church's complaint, consisting of twenty

7

individuals, seven of whom are defendant board members, as the "only properly constituted Board permitted to" change the church building's locks and security codes, provide Yakob with access to Church property, make changes to the Church's registration with the Secretary of State, access or make changes to the Church's bank accounts, or "otherwise act on behalf of the Church or hold themselves out as being entitled to act on behalf of the Church."

In January 2017, following a hearing, a transcript of which does not appear in the record, the court entered a consent interlocutory injunction (the "consent interlocutory injunction"). Similar to the terms set forth in the TRO, in the consent interlocutory injunction, the Defendants and the Church agreed in relevant part (1) as to the identity of the board members; (2) that this board would be the only board authorized to act on behalf of the Church; and (3) Yakob's access to the church building would be limited to the parsonage and the church building for peaceful worship during the Defendants' access periods. The Defendants also agreed to continue to adhere to the alternating access schedule for the competing factions to utilize the church building for worship.

On March 20, 2017, the Defendants requested that the court alter the access schedule set forth in the January 2017 consent interlocutory injunction. Specifically, because the consent interlocutory injunction dealt only with Church access on Sundays, the Defendants sought guidance for Saturdays and the 2017 Holy Week schedule when liturgical events would be held throughout the week. Following a hearing, the court entered a modified interlocutory injunction on April 13, 2017 (the "April 2017 injunction"), setting forth the parties' respective access to the church building and prohibiting Yakob from participating in Holy Week activities in any capacity other than as a parishioner when the Church had use of the building. Similar to the TRO and consent interlocutory injunction, the April 2017 injunction did not limit Yakob's participation in worship services during the times the Defendants had exclusive access to the church building.

In November 2019, the Church filed a motion to compel the defendant board members' attendance at administrative board meetings. Specifically, the Church argued that these members' refusal to attend board meetings had prevented the board from conducting necessary business, and the Church implored the court to deem the board's quorum requirements met even if the defendant board members failed to attend scheduled meetings. The trial court held a hearing, at which it also heard

9

argument related to a request by the Defendants' to modify the April 2017 injunction governing the parties' respective access to the church building for worship. On February 14, 2020, the trial court issued an order (the "February 2020 order): (1) declining to modify the April 2017 injunction, finding that Yakob was not entitled to "unfettered access to property that is owned by the Plaintiff Church and not the Synod"; and (2) granting the Church's motion to compel the defendant board members' attendance at administrative board meetings, and further deeming the board's quorum requirements met if the majority of board members were present. The instant appeal followed.

1. *The Church's motion to dismiss the appeal.* The Church has filed a motion to dismiss this appeal, arguing that (a) this Court lacks jurisdiction because the appeal is an impermissible direct appeal of an order modifying the consent interlocutory injunction and April interlocutory injunction; and (b) the appeal is moot because an administrative board meeting occurred subsequent to the grant of the motion to compel. We disagree for the reasons that follow.

(a) "This Court has a duty to inquire into its jurisdiction to entertain each appeal." *City of Dublin School Dist. v. MMT Holdings, LLC*, 351 Ga. App. 112, 114 (2) (830 SE2d 487) (2019) (citation and punctuation omitted). OCGA § 5-6-34 (a) (4)

allows for direct appeals from "[a]ll judgments or orders granting or refusing applications for . . . interlocutory or final injunctions[.]"

The Church maintains that the appeal is subject to dismissal because the order granting the motion to compel does not constitute a new interlocutory injunction, as it merely modifies the TRO and consent interlocutory injunction. See *Jones v. Peach Trader, Inc.*, 302 Ga. 504, 511 (III) (807 SE2d 840) (2017) ("orders modifying or dissolving interlocutory injunctions are appealable only on an interlocutory basis pursuant to OCGA § 5-6-34 (b)"). In support of this argument, the Church cites the trial court's March 4, 2020 order clarifying that its February 2020 order modified the prior consent interlocutory and April 2017 injunctions, but did not constitute a new injunction. However, "pleadings, motions, and orders are construed according to their substance and function and not merely by nomenclature." *Forest City Gun Club v. Chatham County*, 280 Ga. App. 219, 220 (633 SE2d 623) (2006). Applying this rule of construction, we examine the substance of the trial court's order to determine whether it is subject to direct appeal.

As discussed above, with respect to administrative board matters, the TRO and consent interlocutory injunction identify the individuals who constitute the board and dictate that the individuals identified in the Church's complaint are the only board

11

members authorized to act on the Church's behalf. These orders do not, however, address issues pertaining to the conduct of board meetings or mention quorum requirements. On the other hand, the February 2020 order compels attendance at board meetings or, alternatively, changes the quorum requirements if fewer than 14 board members attend, and this relief is wholly distinct from the relief outlined in the TRO and consent interlocutory injunction. Thus, it constitutes a new injunction subject to direct appeal under OCGA § 5-6-34 (a) (4). Accordingly, we conclude that the portion of the trial court's February 14, 2020 order granting the Church's motion to compel was not merely a modification of the prior interlocutory injunctions, and therefore it is directly appealable.

(b) Next, the Church argues that the Defendants' appeal of the motion to compel is now moot because the board meeting contemplated by the February 2020 order has already occurred. This argument is without merit. "[A] case is moot when its resolution would amount to the determination of an abstract question not arising upon existing facts or rights[;] but a case which contains an issue that is capable of repetition yet evades review is not moot." *Turpen v. Rabun County Bd. of Commrs.*, 245 Ga. App. 190, 192 (1) (537 SE2d 435) (2000) (citation and punctuation omitted). Although at least one board meeting has occurred subsequent to the court's February

12

2020 order, the order itself was not limited to one meeting, and appears to govern all meetings going forward. Indeed, the Church specifically requested that the trial court grant the motion to compel based on the Church's assumption that the defendant board members would continue to refuse to attend board meetings to prevent quorum from being established, and the "Church [did] not want to burden [the trial] [c]ourt with repeated motions to compel the [d]efendant [b]oard [m]embers to attend future [a]dministrative [b]oard [m]eetings." This language implies that the Church was aware that its request potentially covered more than one board meeting. The motion, coupled with the order itself, which is not limited to a single board meeting, demonstrates that the trial court's order granting the motion to compel contemplates ongoing meetings. Thus, the order is not moot, and the appeal is not subject to dismissal on that ground.[5] We now turn to the Defendants' specific claims of error.

2. *Subject matter jurisdiction*. The Defendants argue that the trial court lacked subject matter jurisdiction to rule on the issues in this case, citing a decision the

___

[5] Under OCGA § 5-6-34 (d), we have jurisdiction to consider appeals of the April 2017 injunction, which modified the consent interlocutory injunction, and the portion of the February 2020 order that denied the Defendants' motion to modify the April 2017 injunction.

13

Synod issued in June 2019.[6] This decision by the Synod purports to ecclesiastically resolve the issues between the parties, thus leaving nothing for the trial court to decide.

> The jurisdiction of the court to entertain the complaint, as well as the theory upon which relief is sought, are matters dependent upon the main and material allegations of the pleadings. With specific regard to church disputes, a court of equity will not interfere with the internal affairs of a religious organization, when no property rights are involved, for the reason that civil courts have no jurisdiction of such matters and cannot take jurisdiction of them.

*Bolden v. Barton*, 278 Ga. 831, 831 (1) (607 SE2d 889) (2005) (citations and punctuation omitted). But, "[t]he fact that neutral principles cannot be used to redress one issue . . . does not present a general jurisdictional bar." *Waverly Hall Baptist Church, Inc. v. Branham*, 276 Ga. App. 818, 823 (1) (c) (625 SE2d 23) (2005). We do not reach issues such as excommunication, doctrine, or church discipline because doing so "would bring the Georgia courts into the heart of an ecclesiastical dispute, a position we are eminently unqualified to take and are forbidden to take by the

---

[6] The Church's motion to exclude the Synod's June 2019 decision and other evidence upon which the Defendants rely remains pending in the trial court.

14

constitutional safeguard of separation of church and state." *Kim v. Lim*, 254 Ga. App. 627, 632 (2) (563 SE2d 485) (2002) (citation and punctuation omitted).

The Church's complaint, as amended, seeks a dispossessory writ against Yakob; temporary injunctive relief prohibiting the Defendants from "acting as the [i]mproper [b]oard or otherwise interfering with the orderly administration of the Church"; and (3) declaratory relief proving direction as to the conduct of the extraordinary meeting of the Church's general assembly. Because the matters set forth in the Church's petition involve a dispute over the control of church property and procedural governance matters under the Georgia's Nonprofit Corporation Code, the court had authority to exercise jurisdiction consistent with the Church's hybrid organization. See *Smith v. Mount Salem Missionary Baptist Church*, 289 Ga. App. 578, 579-580 (1) (657 SE2d 642) (2008) (holding principle of separation of church and state did not preclude court from exercising jurisdiction over action by deacons against pastor of church because action involved a dispute over church property and enforcement of church's bylaws); *Srisovana v. Cambodian Buddhist Society, Inc.*, 269 Ga. App. 600, 602 (1) (604 SE2d 637) (2004) (finding court had jurisdiction over dispute involving nonprofit temple's board of directors and disposition of temple property because court did not involve itself in question of who temple members

were); *Members of Calvary Mission Baptist Church v. Jackson*, 259 Ga. App. 647, 647-648 (578 SE2d 275) (2003) (approving court's exercise of jurisdiction over board of director's election dispute).

3. *The trial court's February 14, 2020 order granting the Church's motion to compel*. In relevant part, the Defendants argue that the trial court erred by granting the motion to compel because the order operated as an impermissible mandatory injunction by altering the status quo. We agree.

Regarding a trial court's decision to issue an interlocutory injunction, our Supreme Court has held that

> [a]n interlocutory injunction is an extraordinary remedy, and the power to grant it must be prudently and cautiously exercised. However, to be effective, the decision to grant an interlocutory injunction must often be made under time constraints that do not allow for the careful deliberation and reflection that accompany a full trial on the merits. Thus, the trial court must make a judgment call regarding the equities presented, and the court is vested with broad discretion in making that decision. . . . The grant or denial of an interlocutory injunction will not be reversed on appeal unless the trial court made an error of law that contributed to the decision, there was no evidence on an element essential to relief, or the court manifestly abused its discretion.

16

*City of Waycross v. Pierce County Bd. of Commrs.*, 300 Ga. 109, 110-111 (1) (793 SE2d 389) (2016) (citations and punctuation omitted).

> [I]t is axiomatic that the sole purpose of a temporary or interlocutory injunction is to maintain the status quo pending a final adjudication on the merits of the case. The status quo is not defined by the parties' existing legal rights; it is defined by the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights.

*Hampton Island Founders v. Liberty Capital*, 283 Ga. 289, 293 (1) (658 SE2d 619) (2008) (citations and punctuation omitted). "The party seeking an interlocutory injunction must present evidence that the status quo was endangered and in need of preservation, and a trial court abuses its discretion if it grants the injunction without such showing." *Hipster, Inc. v. Augusta Mall Partnership*, 291 Ga. App. 273, 274 (1) (661 SE2d 652) (2008) (citation and punctuation omitted). Here, there was no such showing by the Church.

In support of the motion to compel, the Church argued that the defendant board members refused to appear for scheduled board meetings in July and October 2019, and these refusals prevented the board from taking action because it could not reach a quorum without these members' attendance. Specifically, the Church claimed it had

17

received an offer from the Decatur Housing Authority to purchase a piece of real property owned by the Church, and the Church could not consider the offer without a quorum. It further claimed that the Church's bylaws needed to be amended, and this action could not take place due to the absence of certain members from board meetings. Citing the TRO's and consent interlocutory injunction's identification of the composition of the board, the Church argued that those prior orders *required* board action, and asked the court to "compel compliance" with its previous orders. However, as discussed above in Division 1 (a), contrary to the Church's argument, the February 2020 order did not simply modify or compel compliance with the previous orders.

In its complaint, the Church sought to preserve the status quo by prohibiting the Defendants from blocking the entrance to the church building or taking other actions which would disrupt worship services. Additionally, the Church pursued an injunction to prohibit the replacement board from acting "pending resolution of the question as to the [replacement]'s authority to act on behalf of the Church." The TRO and consent interlocutory injunction addressed these very issues by barring the Defendants from disrupting Church services and identifying the board members as those individuals named in the Church's complaint.

18

The Church failed to submit evidence or argue that the status quo was in jeopardy or that it would suffer irreparable harm if the injunction was not granted. Indeed, the court made no finding that the status quo was endangered or in need of preserving. Rather than maintaining the status quo as established in the TRO and consent interlocutory injunction, by granting the motion to compel, the trial court required the defendant board members to attend meetings, and permitted a group of board members to act without the defendant board members' input.

Accordingly, because the injunction does not in fact preserve the status quo, we find the trial court abused its discretion by granting the interlocutory injunction compelling the defendant board members' attendance at administrative board meetings and deeming the quorum requirement satisfied under the terms set forth in the order. See *Hipster, Inc.*, 291 Ga. App. at 274-275 (1) (finding that trial court abused its discretion by issuing interlocutory injunction requiring mall's tenant, a clothing store, to vacate its current space and relocate to smaller space located within the mall because interlocutory injunction did not preserve the status quo, and mall failed to make showing of vital necessity or that mall would suffer irreparable harm if trial court denied motion for interlocutory injunction); *Hampton Island Founders*, 283 Ga. at 293-294 (1) (a)-(b) (reversing trial court's grant of interlocutory injunction

19

that prohibited LLC from contesting investors' voting rights in LLC's member entities; injunction changed status quo by enabling investors to vote, although they possibly were not entitled to vote, and trial court failed to balance equities properly as "there was no 'vital necessity' for the issuance of the . . . injunction") (citation and punctuation omitted); *Green v. Waddleton*, 288 Ga. App. 369, 371 (1) (654 SE2d 204) (2007) (concluding that trial court abused its discretion by granting interlocutory injunction requiring kennel owner to cease operating kennel and remove animals from property because, among other factors, there was no evidence or finding by trial court that status quo was endangered or in need of preservation, and injunction did not actually preserve status quo).

4. *The April 2017 injunction*. The Defendants next challenge the trial court's April 2017 injunction on the ground that the order constitutes an unconstitutional restraint on Yakob exercising his religious role as Archishop.

The Defendants moved to modify the consent interlocutory injunction to, in relevant part, alter the access schedule for Holy Week ceremonies. As noted above, the TRO and consent interlocutory injunction set forth alternating schedules for the parties to access the church building. Specifically, the TRO granted the Defendants "access to the Church building from 1:00 p.m. until 5 p.m. on Sundays for peaceful

20

worship services." In its orders, the court noted its intention "that worshipers at the Church may enter upon the premises to engage in worship services in peace as they are normally conducted consistent with this [o]rder." With respect to Yakob's access to the property, the court allowed him to continue to reside in the parsonage and utilize "the Church building from 1:00 p.m. to 5:00 p.m. on Sundays for peaceful worship[.]" The consent interlocutory injunction granted the Church afternoon and evening access to the Church, and granted the Defendants access from 6:00 a.m. to 12:00 p.m. "for peaceful worship services[.]" Neither order limited Yakob's activities during the time periods when the Defendants had access to the church building or dictated what his role should be. And, the parties already had agreed to scheduling and access constraints as part of the consent interlocutory injunction.

Neither the Defendants' request to modify the April 2017 injunction nor the Church's response thereto appear in the record, but the parties presented argument on the request at a hearing. Specifically, the Defendants requested that the court issue a decision on (1) Holy week access; (2) Saturday access; and (3) computer access. At the hearing held on the motion to modify, the Defendants noted that the parties disagreed as to who could conduct the liturgy on Easter Saturday, with the Church having the liturgy performed by a priest appointed by the administrative board, and

the Defendants seeking to have Yakob perform the liturgy via his position as Archbishop. The Church responded that: "The only real issue at this point and the only real issue on access to the church [building] is, whether it's on alternating Saturdays or whether it's during Holy Week, is that the access that [the Defendants] seek is for [Yakob]." According to the Church, "[Yakob] is a terminated employee of the [C]hurch in his capacity as the priest," and the status quo would be upset if Yakob were permitted additional access.

The Defendants challenge the portion of the April 17 injunction that states:

Defendant Yakob may attend the Church's services as a parishioner, but he is prohibited from presiding over, controlling, or attempting to preside over or control the Church's services in any way. Defendant Yakob may enjoy the Church's services from the pew, but he may not enter areas of the Church's sanctuary for which access to parishioners is prohibited and may not participate in those services in any role other than as a parishioner.

According to the Defendants, the trial court erred by circumscribing Yakob's activities as Archbishop by relegating him to the pews and limiting his role to that of parishioner.

The First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious,

22

however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property.

*Howard v. Johnson*, 264 Ga. App. 660, 662 (1) (592 SE2d 93) (2003) (citations and punctuation omitted).

In the instant case, there is no dispute that the church building is wholly owned by the Church. And, the complaint addresses itself to matters outside of First Amendment jurisprudence, such as issues of Church property and board governance issues. Given the Church's hybrid form of governance, as first recognized in *Kidist I*, those property and governance issues are capable of resolution by reference to neutral principles of law. Importantly, nothing in the April 2017 injunction relates to the propriety or validity of Yakob's termination as priest, or his role as Archbishop. A minimal intrusion by the government into religious affairs may be constitutionally permissible. See *Lemon v. Kurtzman*, 403 U. S. 602 (91 SCt 2105, 29 LE2d 745) (1971) (setting forth a three-part test for evaluating establishment clause questions; to wit: (1) any governmental action affecting religion must have a secular purpose; (2) the primary effect of that governmental action must be one that neither advances one religion nor inhibits another religion; and (3) the governmental action must not

constitute an excessive entanglement of government with religion). Here, the April 2017 injunction is a temporary measure, limited to the property dispute, which is properly before the civil court, and it is narrowly and neutrally drafted to continue the basic elements already agreed to by the parties in the consent interlocutory injunction.[7] See generally *Hargrett v. Dickey*, 304 Ga. App. 387, 389 (2) (696 SE2d 335) (2010) ("In the absence of fraud or mistake, a party cannot complain of a judgment, order, or ruling that his own conduct produced or aided in causing.") (citation and punctuation omitted). Significantly, the April 2017 injunction does not interfere with Yakob's ability to lead the service during the times agreed upon by the parties in the consent interlocutory injunction.

According to the Defendants, the Synod rendered a pronouncement and the patriarch issued a directive that Yakob is to "assume his duties and seat of power at Kidist St. Mariam Church," and this mandate required the trial court to rule in the Defendants' favor by allowing Yakob to preside over church services. We disagree that this outcome is required, or even permissible in civil court. The trial court is

---

[7] To the extent that the Defendants argue in their reply brief that they were attempting to withdraw their consent to the consent interlocutory injunction, they did not raise this argument in the trial court, and we will not consider it for the first time on appeal. *Shelley v. Town of Tyrone*, 302 Ga. 297, 308 (3) (806 SE2d 535) (2017).

without authority to intervene in the nonsecular dispute between the Church and the Synod concerning Yakob's religious role within the Church. But, instead of impermissibly delving into ecclesiastical matters concerning Yakob's dual role as priest and Archbishop, or the Archbishop's function during Holy Week festivities, the trial court's order does just the opposite. The April 2017 injunction maintains the status quo by continuing the narrow limitations imposed in the TRO and agreed to by the parties in the consent interlocutory injunction pending the resolution of the underlying issues. Accordingly, under the circumstances present here, the First Amendment does not prohibit the trial court's exercise of judicial authority in the property dispute. See *Kim*, 254 Ga. App. at 632 (2) (First Amendment did not bar trial court's consideration of claims relating to disposition of church property); *Kidist I*, 219 Ga. App. at 473 (1) (holding that dispute over ownership of certificate of deposit owned by church was capable of resolution by reference to church's articles of incorporation and bylaws and Nonprofit Corporation Code, and thus First Amendment values did not preclude trial court from exercising judicial authority).

*Judgment affirmed in part and reversed in part. Barnes, P. J., and Pipkin, J., concur.*

25